New Jersey Department of Labor,
Workmen's Compensation Bureau.

SAMUEL SVEREPA, ALSO KNOWN AS SEMEL SVEREPA, PETITIONER, v. THE MANHATTAN RUBBER MFG. DIVISION OF RAYBESTOS-MANHATTAN, INC., RESPONDENT.

Decided April 18, 1940.

For the petitioner, *Nathan Rabinowitz.*

For the respondent, *Norman E. Darmstatter* and *James J. Skeffington.*

\* \* \* \* \* \* \*

There is no question, according to the evidence adduced in this case, that the petitioner is now suffering with a disability equivalent to total, that is, the condition of hemiplegia, involving a paralysis of his entire left side, renders him unfit for any type of gainful employment. The sole issue, decisive of the present case, is the question of whether or not the hemiplegic condition is due to a compensable accident or due to natural causes.

Now a hemorrhage in the brain or in any other part of the body is the same, that is, the resulting effect is the same whether it be caused by trauma or by a diseased vessel wherein a rupture spontaneously takes place without any outside force or violence. So that when the foreman returned to the basement after being absent for a half hour or so, and observed

the petitioner lying on the floor, the hemiplegia had already taken place; whether it was caused by a direct blow to the head or by a diseased vessel, rupturing of its own accord, is a matter of proof.

The case is simply this—and its solution turns on this point—if the petitioner's testimony is worthy of belief and is to be accepted as representing the true factual situation, then the petitioner is entitled to a recovery. He testified that on the day in question he was standing on a barrel in a storage basement drilling holes in a concrete beam. I think it might be well to clarify any misunderstanding as to the size and shape of the said barrel, by briefly describing it: It was a low type drum-shaped wooden structure about two feet high. The concrete beam in which the holes were being bored was approximately six feet distant from the floor. While it was physically possible to manipulate the hammer and chisel with both feet on the floor as indicated by counsel for the respondent, it was necessary for the petitioner, in order to get proper leverage on the hammer and to swing his arms freely from the most advantageous position, to elevate himself two feet or so from the floor. This was quite apparent on inspection of the premises. Photographs of the basement which were introduced in evidence seem to corroborate the fact, that to perform the job while standing on the floor, both arms would have to be stretched upward to their full length. I don't think it has been seriously controverted by the respondent that, in doing this particular job, the petitioner stood on some low object to elevate himself somewhat.

Petitioner, according to the testimony, was assigned to drilling holes in the concrete beams as his first job on the morning of June 28th, 1937. He was instructed by Musial, his foreman, to make ten or twelve holes in two overhead concrete beams alongside the various aisles in the basement; that he had finished six holes in the first beam and was working on the second beam in which he had already completed two holes and was drilling the third hole when the mishap took place. He testified that during the early part of the morning while he was engaged on the first six holes, he experienced a peculiar weak and sickish feeling, I believe he referred to it

as a poisonous feeling; that he became ill due to this nauseous feeling; that he went outside for awhile to get some fresh air and that he then returned to work. While he described the atmospheric condition in the basement as fumes and gases, I am satisfied what he actually meant was obnoxious odors or at least odors with a very unpleasant smell. Now according to his testimony, while engaged in drilling the third hole in the second concrete column, he became ill again from these "so-called fumes;" and fell to the floor, striking his head against one of the barrels in the aisle. That, in substance, is his testimony. He seems to know little as to what took place thereafter, but he recalls that when Musial returned to the basement sometime later, he (petitioner) was still lying helplessly on the floor, with his body partly elevated, that is, his head was resting against one of the small barrels.

Now, what appears to be a very significant factor in the case is this: during the entire period in which petitioner was engaged drilling holes, he was alone in the basement. Whether or not the accident as described by him took place is a matter solely within his peculiar knowledge; particularly the act of falling and striking his head against a barrel; all of which in the final analysis becomes a question of credibility, pure and simple. No one witnessed the occurrence. Musial, the foreman, was called away from the basement for a half hour or so to make an inspection in the yard, of freight trains loaded with materials, which required checking by Musial, before unloading. This task consumed about a half hour. He returned to the basement immediately thereafter.

Obviously the respondent's sole defense is an attempt to discredit petitioner's testimony as to what took place on the morning in question. Of course, when petitioner was found lying on the floor by Musial, partly slumped over on a barrel, he had already vomited, because, as I recall the testimony, there was presence of a vomitus smell and residue, which to all intents and purposes had come from the petitioner. He wasn't at all talkative at the time. It is true that his explanation to Musial is rather meager, namely, as I recall it, "gas got me; I fell." There is no doubt in my mind at that time the effect of petitioner's condition, that is, the cerebral

hemorrhage, had become plainly manifested. While he was conscious, yet he wasn't, in a true sense, fully oriented to the extent of a normal person. The reason for his failure to talk while being taken home in the car of a fellow-worker, accompanied by two other fellow-employes, is quite obvious— he was too sick. To one so seriously ill with a stroke of apoplexy, it is quite understandable that he would not be in talkative mood; not even to the point of telling his friends what had happened. I, therefore, attach very little weight to such circumstances, to wit, his failure to talk to his co-workers during the trip in the automobile to his home. As a matter of fact, as I recall the testimony, he merely pointed out the house where he lived. The question as to whether or not there was any evidence of external injury is likewise in conflict; particularly as to whether there was a bump or lump on his head. As I recall the testimony, however, the area where the petitioner claimed there was a bump or swelling, and which was corroborated by his wife, was in the hairy portion of his head. Respondent denied the presence of any such lump. Since the petitioner has a very thick thatched head of hair, it is within reasonable probability that a casual observer, not making a careful examination, might overlook such bump or lump hidden inside the hair portion of the head.

Now it seems to me that the respondent's testimony, while a direct attack upon the petitioner's credibility, attempts to ascribe the hemoplegia to natural causes, independent of trauma, and superinduced by excess drinking the night before. It is negative testimony to a large extent. I feel that the doctrine as enunciated in the case of *Atchison* v. *Colgate Co.,* 102 *N. J. L.* 425; 131 *Atl. Rep.* 921, is controlling in the present situation, to wit: "If the employer seeks to avoid liability for a cause for which it is not responsible, the burden of proof is on the employer to show such cause." Therefore it seems to me in line with that doctrine the burden of evidence shifted upon the respondent to prove some other cause if it would escape liability on that ground. The only "other cause" it advances is that the petitioner had been drinking freely the night before; that he may have suffered from some of the residual effects of a hangover; and when he reported for work

on the morning of June 28th, 1938, the weak feeling in his general system caused him to vomit and fall. Now of course, if that be so, the respondent would be entitled to a dismissal of the petition; but I feel again a very significant fact is the lack of proof of whether the vomiting preceded the fall or the fall preceded the vomiting. No one but the petitioner is competent to testify whether the fall preceded the vomiting or whether the vomiting spell preceded the fall; since both the fall and the vomiting spell had taken place when the petitioner was found lying on the floor by Musial on his return to the basement. It is true that most any kind of shock may be accompanied by vomiting. In other words, a person, as here, who falls and strikes his head is likely to be seized with subsequent vomiting. There is no evidence by which an inference might be drawn that the petitioner's vomiting preceded the fall or that the fall was brought about by a weak spell caused from excess drinking the night before all of which made him lose his balance and fall to the floor.

I made a personal inspection of the premises upon the conclusion of the trial which has proved helpful to me in arriving at a decision. The premises consisted of a large basement airiated by numerous vents in which were stored various materials, in barrels, bags and other containers, systematically placed in aisles and labeled with overhanging signs. However, there was one thing quite noticeable, and that was the presence of a very peculiar and unpleasant odor. Strangely, this odor has been described by the chief chemist and by several other employes, whose testimony in the main seemed to impress me quite favorably, as aromatic or a smell similar to that found in an apothecary or drug store. From what I observed at the time of the inspection and from my reaction, I am satisfied the particular odor was quite different from that. It was a conglomeration of various odors all mixed into one, and I can readily understand how it might have an unfavorable reaction on one's system, particularly if one is— well, slightly below par such as the petitioner was claimed to have been, according to the testimony of the respondent. If, as claimed, the petitioner had been drinking the night before and his stomach was still weak from a hangover, certainly

this pungent odor as I observed it on my inspection and which I assume existed to the same degree on June 28th, 1938, would in my opinion, be a precipitating factor in producing the weak spell, the fall and the after-events which took place. In nowise has his testimony been successfully attacked as to the necessity of leaving the basement on the first occasion in search of fresh air. No one was present to witness the incident since Musial was engaged elsewhere. Petitioner stated that after finishing the last hole in the first column of six holes, he felt a little weak to his stomach, went outside for some fresh air and when he returned to the basement he felt all right again. He then continued at his work and had completed two holes and was on the third hole of the second column when he fell.

It seems to me in short, therefore, that we are dealing with a case in which the facts, as established by the more credible testimony lead to the inescapable conclusion that the petitioner has sustained the burden of proof in showing that trauma, following the fall, was the cause of the hemorrhage in the brain and not a spontaneous rupturing of a diseased vessel weakened by arteriosclerosis. Petitioner's testimony of an accidental fall induced by conditions of his employment has not been overcome by the respondent in its attempt to establish some other cause. In so far as the testimony of Musial is concerned, it must be remembered that he still works for the respondent and is not on friendly terms with the petitioner. It became quite apparent from the testimony that strained feelings existed between them. At one time, Musial was the tenant of the petitioner and became incensed when the petitioner raised his rent, subsequently moving elsewhere. I mention this only as a means of explaining the sharp conflict between the testimony of the petitioner and that of Musial. However, I am inclined to accept the testimony of the petitioner as the more credible.

In so far as the medical testimony is concerned there seems to be no serious dispute between the doctors as to the condition of the petitioner and the extent of his present incapacity. They have all testified in substance, that he is suffering from the effects of a hemiplegia; that his paralysis involves his

entire left side; that his ability to work is practically nil, and that his present disability is 100 per cent. of total.

Accordingly, I have reached the conclusion that petitioner has sustained the burden of proof in establishing his right to compensation, namely that on June 28th, 1938, while drilling holes in a concrete column, standing on a barrel two feet in height, he became nauseated with a sick feeling to his stomach by reason of obnoxious odors permeating throughout the basement, causing him to lose his balance and fall, striking his head against one of the small barrels and that as a result of the fall superimposed upon an already sclerosed condition of his arterial vessels, he suffered a cerebral hemorrhage, resulting in his present hemiplegia. I feel satisfied from the evidence that the hemorrhage involved one of the smaller vessels in the brain because the petitioner was not seized with immediate unconsciousness. A trauma may cause a hemorrhage in a large vessel as well as in a small vessel. I do not attach much significance to the contention of the respondent's counsel when he argues to the effect that absence of unconsciousness immediately following the fall disproves that a hemorrhage took place at the time when Musial discovered petitioner lying on the floor.

\* \* \* \* \* \* \*

JOHN J. STAHL,
*Deputy Commissioner.*